# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LISA H.,[1] <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI,[2] <br><br> Acting Commissioner of Social Security, <br><br> Defendant. | Case No. 20-cv-03322-RMM |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ms. H. brings this action under the Social Security Act, 42 U.S.C. § 405(g), seeking review of the decision of the Commissioner of Social Security ("Commissioner") to deny her claim for disability insurance and supplemental security income benefits.  District Judge Carl J. Nichols referred the case to the undersigned for all purposes upon the parties' consent.  *See* Sept. 23, 2021 Min. Order.  Pending before the Court are Ms. H.'s Motion for Judgment of Reversal, ECF No. 12, and the Commissioner's Motion for Judgment of

---

[1] Plaintiff's name has been partially redacted in keeping with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Mem. from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt., to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf.

[2] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Federal Rule of Civil Procedure 25(d) and the last sentence of 42 U.S.C. § 405(g), Ms. Kijakazi is substituted for Andrew Saul as the Defendant in this case.

Affirmance, ECF No. 16.  Upon consideration of the Administrative Record,[3] the parties' briefs,[4] and the relevant law, the Court denies Ms. H.'s Motion for Judgment of Reversal and grants the Commissioner's Motion for Judgment of Affirmance.

## BACKGROUND

Ms. H. applied for disability insurance and supplemental security income benefits on September 19, 2017, alleging that she had been disabled since July 1, 2016 ("onset date"), when she was 44 years old.  *See* AR 40, 49.  Her disability claim is based on a right rotator cutoff tear, left ankle ligament tear, migraines, and major depression disorder.  *See* Pl.'s Mem. at 1; Def.'s Mem. at 2.  Ms. H. is a high school graduate.  *See* AR 49.  She has not engaged in substantial gainful activity since her onset date.  *See* AR 43, 49.

Ms. H.'s application for benefits was denied at both the initial and reconsideration levels of review.  *See* AR 40.  The Administrative Law Judge ("ALJ"), M. Krasnow, conducted a hearing on August 15, 2019, but Ms. H. had to leave without testifying due to a medical situation.  *Id*.  The ALJ conducted a supplemental hearing on January 3, 2020, at which Ms. H. appeared and testified.  *Id*.  On February 19, 2020, the ALJ concluded that Ms. H. was not disabled for purposes of the Social Security Act.  *See* AR 51.  The Social Security Administration's Appeals Council denied Ms. H.'s request for review.  *See* AR 1.  Ms. H. now asks this Court to vacate the ALJ's decision, which constitutes the Commissioner's final

---

[3] Page citations to the Administrative Record, ECF No. 10 ("AR"), refer to the running pagination at the lower right margin.

[4] The relevant briefs are Ms. H.'s Mot. for J. of Reversal, ECF No. 12 ("Pl.'s Mem."); the Commissioner's Mot. for J. of Affirmance and in Opp'n to Ms H.'s Mot. for J. of Reversal, ECF No. 16 ("Def.'s Mem."); and Ms. H.'s Reply in Support of her Mot. and in Opp'n to the Commissioner's Motion, ECF No. 19 ("Pl.'s Reply").  Throughout this Memorandum, page citations to documents other than the AR refer to the document's original pagination, unless the page is designated with an asterisk (e.g., *1), in which case the reference is to the pagination assigned by PACER/ECF.

decision, and remand her application to the Social Security Administration pursuant to 42 U.S.C. § 405(g).  *See* Pl.'s Mem. at 1.

## I.    Legal Framework

To qualify for benefits under the Social Security Act, a claimant must demonstrate a disability that renders her unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of [at least] 12 months."  42 U.S.C. §§ 423(a), 423(d)(1)(A), 1382(a)(1), 1382c(a)(3)(A).  An applicant must support her claim with "[o]bjective medical evidence."  *Id*. § 423(d)(5)(A).

The Commissioner uses a five-step process to determine whether a claimant is disabled under the Social Security Act.  20 C.F.R. §§ 404.1520, 416.920; *see also Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004) (describing each step).  At step one, the claimant must show she is not engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step two, the claimant must show she has a "severe medically determinable physical or mental impairment" or combination of impairments.  *Id*.  At step three, the Commissioner must determine whether the claimant's impairment or impairments meet or equal an impairment in the Commissioner's Listings maintained at 20 C.F.R. pt. 404, subpt. P, app. 1.  *Id*.  If the claimant's impairment is listed, or if her impairments together equal an impairment in the Listings, the Commissioner will conclude that the individual is disabled and end her inquiry.  *Id*.; *see also Petty v. Colvin*, 204 F. Supp. 3d 196, 200 (D.D.C. 2016).  If the claimant's impairment does not meet or equal a Listing, the Commissioner next determines the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(a)(4), (e), 416.920(a)(4), (e).  An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from

3

her impairments.  *Id*. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC is then used to determine, at

step four, whether the claimant can perform any "past relevant work," and at step five, whether

the claimant can perform other work that exists in the national economy consistent with the

claimant's RFC, age, education, and work experience.  *Id*. §§ 404.1520(a)(4), 416.920(a)(4); *see*

*also Butler*, 353 F.3d at 997.  If an individual's claim fails at either step four or step five, the

Commissioner will conclude that the individual is not disabled and deny the claimant's benefits

request.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

**II.    Record Evidence**

The Court will focus its record evidence discussion on Ms. H.'s left ankle, right shoulder,

and mental impairments because the parties' briefs primarily focus on these impairments.

**A.    Left Ankle Impairment**

Ms. H. severely sprained her left ankle at work in May 2005.  *See* AR 501–02.  She

underwent surgery in April 2016.  *See* AR 651–52.  After the surgery, post-surgical changes

caused some limitation with metallic artifact, along with mild soft tissue edema, increased signal,

and irregularity of the peroneal tendons.  *See* AR 649–650.  In 2018, doctors observed that Ms.

H. had a mildly decreased plantar arch, *see* AR 1793, nerve entrapment in the ankle region, *see*

AR 794–95, and a chronic sprain of the anterior talofibular ligament ("ATFL") or a complete

rupture, *see* AR 795–96, 1038.  Despite these more concerning findings, doctors noted that there

was no swelling, erythema, or edema.  *See* AR 795.  And the possibility of the ATFL was noted

as an insignificant issue.  *See* AR 795–96, 1038.  She continued to experience swelling, diffuse

pain and guarding of the ankle, and she had a mild, antalgic, and stiff gait.  *See* AR 1158, 1164,

1508.  In 2019, physician notes revealed that Ms. H. agreed with the recommendation of no

surgical intervention on her ankle and acknowledged that she was satisfied with this decision. *See* AR 1208.

### B.    Right Shoulder Impairment

Ms. H. injured her right shoulder in April 2016.  *See* AR 647.  An MRI evaluation of her right shoulder in November 2016 revealed a large near complete tear of the supraspinatus tendon.  *See id*.  She underwent surgery on her right shoulder in February 2018.  *See* AR 787–88. Following surgery, in May 2018, physician notes showed that she had limited range of motion in her right shoulder.  *See* AR 989.  Ms. H. continued to complain of persistent right shoulder and arm pain.  *See* AR 989–90.  For instance, in physical therapy in September 2018, while reporting that her shoulder was "healing fine per her doctor," Ms. H. noted having significant pain in the right shoulder, having difficulty with everyday activities, and demonstrating significant guarding and cradling.  *See* AR 1604.  In December 2018, an MRI evaluation revealed a new rotator tendon tear, *see* AR 1271, and a surgical anchor scarring in the supraspinatus tendon, *see* AR 1257–58.  Despite some degeneration of her cuff, the majority of her repair did heal and the anchor that moved was not causing any problems.  *See* AR 1266.  Rather, her biggest problem was stiffness.  *See id*.  She was recommended physical therapy rather than surgery to regain motion.  *See id*.  On several occasions, Ms. H. reported that medication was helpful in addressing her shoulder pain.  *See* AR 965 (reporting that medication Gabapentin was mildly helpful); *see also* AR 1160 (reporting that she feels medication is "really helping").  In June 2019, Ms. H. went to the emergency room for shoulder pain.  *See* AR 956–86.  She indicated no interest in following up with an orthopedic specialist and was discharged in stable condition.  *See* AR 966.

### C.      Mental Impairment

In May 2019, Ms. H. reported that she had been depressed since the death of her son in 2008.  *See* AR 1184.  She has associated her severely depressed mood with multiple stressors involving her home, illness, and financial issues.  *See* AR 1372.  When she presented for a mental health appointment in September 2017, the clinician noted that her mood was determined, her affect was appropriate, and her judgment and insight were good.  *See id*.  In April 2018, Ms. H. displayed fair insight, judgment, good motivation, and no suicidal ideation.  *See* AR 804, 808.  Clinician notes from 2019 show that she was well-groomed with normal speech and orientation to time, place, and person.  *See* AR 1179.

## III.   Testimony at the Administrative Hearing

At the administrative hearing on August 15, 2019, Ms. H. could not testify due to medical conditions.  *See* AR 40.  Her counsel noted that she had a history of migraines, severe left ankle pain, severe right rotator cutoff injury, depression, HIV infection, and some side effects of medication.  *See* AR 94–95.  After a brief exchange with Ms. H.'s counsel about Ms. H.'s medical conditions, the ALJ then proceeded to ask Dr. James Ryan, the vocational expert, a series of hypothetical questions.

First, the ALJ proposed a hypothetical individual of Ms. H.'s age and education, who can perform the full range of light work, except she can occasionally push and pull with the right upper extremity and the left lower extremity; can frequently balance and kneel; occasionally climb ramps and stairs and crawl; never climb ropes, ladders or scaffolds; can frequently reach in all directions overhead and laterally, with the right upper extremity; must avoid concentrated exposure to hazards such as dangerous machinery, unprotected heights and parts; is further limited to simple, routine, repetitive tasks with no production rate for pace of work; and can

occasionally interact with the general public.  *See* AR 97–98.  Dr. Ryan first concluded that Ms.

H. would be precluded from undertaking her past work as a furniture/carpet cleaner under that

scenario.  *See id.*  Dr. Ryan testified that such an individual could work as a packer, office

helper, and inspector.  *See* AR 98.  He noted that each of these positions is from the light,

unskilled occupational base.  *See id.*  Second, the ALJ modified the hypothetical so that the same

individual could occasionally balance, stoop, kneel, and crouch.  *See* AR 98–99.  Dr. Ryan

responded that all of the positions would remain.  *See* AR 99.  Third, the ALJ moved to the

sedentary exertional level, with the same hypothetical individual.  *See id.*  Dr. Ryan responded

that such an individual could work as a finish machine tender, table worker, and security worker.

*See id.*  He noted that each of these positions is at a sedentary exertional level and unskilled.  *See*

*id.*  Fourth, the ALJ asked if the hypothetical individual could perform such jobs if she could

never push or pull with the left lower extremity, and Dr. Ryan testified that such jobs would

remain available.  *See id.*

Next, Ms. H.'s counsel asked Dr. Ryan if the jobs would be available if the first or

second hypothetical individual could only occasionally use the bilateral upper extremities for

fine, gross, or dexterous movement.  *See* AR 100.  Dr. Ryan testified that the jobs would be

precluded, but there would be other positions at the light exertional level.  *See* AR 101.  Lastly,

Ms. H.'s counsel added to the hypothetical that the individual either would miss two or more

days of work per month, due to the effects of migraines, depression or the side effects of

medication, or would be off task twenty percent or more of the day.  *See id.*  Dr. Ryan testified

that the individual could not sustain full-time employment in either case.  *See id.*

The ALJ conducted a supplemental hearing on January 3, 2020 and heard testimony from

Ms. H. regarding her subjective experience of symptoms related to her physical and mental

illnesses.  Ms. H. discussed how her aides, who assist Ms. H. on the weekdays and weekends,

"help[] [her] out a lot," and her neighbor helps when her aides are not around.  AR 72–73.

Before she had the aide, her daughter helped her get around and also did house chores.  *See* AR

84.  Ms. H. testified that she had not gone anywhere by herself in "[o]ver a year."  AR 73.  Ms.

H. discussed generally how her shoulder and ankle pain impact her ability to walk and do

household chores like cooking and bathing.  *See* AR 72–74, 75–76.

    As to the side effects of medications, she testified that she experienced "just a little . . .

dizziness" and did not have any other side effects.  AR 71–72.  Since 2016, Ms. H. had fallen

"[l]ike three times."  AR 82.  As for migraines, she testified that she took Topamax twice a day

for migraines and that the doctors had not made attempts to change or increase medications.  *See*

AR 77–78.  As to depression, she mentioned that she experienced depression several times per

week in the form of "just feeling down," and had no thoughts of suicide and no thoughts of guilt

or worthlessness about herself.  AR 80–82.  Ms. H. noted that she has "a lot of pain in [her]

cervical spine."  AR 80.  Finally, Ms. H. testified that her carpal tunnel has made it so that she

"can't grab," "can't lift," or do any activities with her arms.  AR 83.

## IV.    The Commissioner's Decision

    The ALJ issued his decision on February 19, 2020, finding that Ms. H. was not disabled

and accordingly not entitled to disability insurance or supplemental security income benefits

under the Social Security Act.  *See* AR 40–51.  At step one, the ALJ determined that Ms. H. had

not engaged in "substantial gainful activity" since her onset date.  AR 43.  At step two, the ALJ

found that Ms. H. had "severe impairments" of "osteoarthritis, status post right rotator cuff

repair, status post left ankle fracture, and an affective/mood disorder."  *Id*.  He also

acknowledged Ms. H.'s non-severe impairments of HIV, cervical spinal stenosis, and migraines,

but found that they "do not cause more than a minimal limitation in the ability to perform basic work activities." *Id.*

At step three, the ALJ found that Ms. H. was not disabled because her impairments did not meet or equal the severity of any Listings. *See* AR 43–44. First, he concluded that Ms. H.'s physical impairments did not meet or medically equal the criteria of any impairments listed in Listing 1.00 for musculoskeletal disorders. *See* AR 44; 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00.

Next, the ALJ considered Ms. H.'s mental impairments as potentially qualifying under Listing 12.04. *See* AR 44; 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04. The paragraph B criteria for this listing requires that a claimant's mental impairments result in "extreme" limitation in one or "marked" limitations in two of the Commissioner's Post-2017 Functional Areas. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A)(2)(b). The ALJ determined that Ms. H. did not meet that requirement, because she had "moderate" limitations in two of the areas, and only "mild" limitations in the other two areas. AR 45 (concluding that her "understanding, remembering or applying information" and "adopting or managing oneself" were "mild" limitations and her "interacting with others" and "concentrating, persisting or maintaining pace" were "moderate" limitations). He also determined that Ms. H. failed to satisfy the Paragraph C criteria for the examined Listings because Ms. H. had "no inpatient psychiatric hospitalizations during the relevant period" and could "care for most of her personal needs with minimal or no difficulty." AR 45.

Finally, the ALJ considered whether Ms. H. had the residual functional capacity to perform work. The ALJ determined that Ms. H. retained the RFC to:

> perform light work . . . except she is able to occasionally push and pull with the right upper extremity and the left lower extremity. She is able to occasionally balance, stoop, kneel, crouch, climb ramps and stairs, and crawl, and never climb ladders, ropes or scaffolds. Further, she is able to frequently reach in all directions,

overhead and laterally with the right upper extremity.  She is limited to simple, routine and repetitive tasks, with no production rate for pace of work.  Finally, she is able to have occasional interaction with the general public.

AR 45.  In working towards this conclusion, the ALJ found that Ms. H.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence.  *See* AR 46.  In formulating the RFC, the ALJ considered Ms. H.'s testimony, *id.*, the opinions of the State Agency psychological consultants, which he found to be "generally persuasive," the opinions of the State Agency medical consultants, which he also found "generally persuasive," the opinions of Dr. Aleskow and Dr. Walker, which he found "not persuasive," the opinions by medical providers, which he found "less persuasive," and the opinion of Teresa Acquaviva, which he found "not persuasive." AR 48.

The ALJ then considered whether there were jobs in the national economy that Ms. H. could perform based on her age, education, work experience, and RFC.  *See* AR 50.  After considering the opinions of the vocational expert, the ALJ found that Ms. H. could work as a packer, general office helper, or inspector.  *Id.*  Thus, the ALJ concluded that Ms. H. was not disabled because a significant number of jobs existed in the national economy that she could perform.  *Id*.

## LEGAL STANDARD

The Court will uphold the Commissioner's decision to deny an individual disability benefits if the decision "is based on substantial evidence in the record and correctly applies the relevant legal standards."  *Butler*, 353 F.3d at 999.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971) (internal quotation and citation omitted); *see also Butler*, 353 F.3d at 999 (substantial evidence is "more than a scintilla, but . . . less than a preponderance"); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency [in the administrative appeals context] is not high.").  The Court must carefully scrutinize the entire record, but may not reweigh the evidence, *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (citing *Brown v. Barnhart*, 370 F.Supp.2d 286, 288 (D.D.C.2005)), because the "[s]ubstantial-evidence review is highly deferential to the agency fact-finder," *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

## DISCUSSION

Ms. H. raises several challenges to the ALJ's assessment of her RFC.  *See* Pl.'s Mem. at 5.  First, Ms. H. argues that the ALJ failed to adequately explain the evidence he relied on to determine that she could perform "simple, routine, repetitive tasks, with no production rate for pace of work," and he failed to explain the term "production rate for pace of work."  *Id.* at 7.  Second, the ALJ failed to include Ms. H.'s limitations in concentration, persistence, or pace in both his RFC assessment and his hypothetical questions to the vocational expert.  *See id.* at 10.  Third, the ALJ failed to perform a function-by-function assessment of Ms. H.'s abilities to perform work-related activities.  *See id.* at 15.  Finally, the ALJ failed to properly evaluate relevant evidence.  *See id.* at 17.

The Commissioner defends the ALJ's decision and urges the Court to affirm.  *See generally* Def.'s Mem.  She argues that substantial evidence supports the ALJ's decision.  First, she argues that the phrase "production rate for pace of work" is clear and the ALJ adequately explained the meaning of the phrase.  *See id.* at 10–14.  Second, the ALJ adequately

accommodated Ms. H.'s limitations in concentration and persistence in his RFC assessment.  *See id.* at 14–16.  Third, the ALJ performed a proper function-by-function assessment of Ms. H.'s ability to perform work-related activities so remand is not warranted.  *See id*. at 16–20.  The Court will review the parties' arguments below.

## I.      "Simple, Routine, Repetitive Tasks, with No Production Rate for Pace of Work"

The ALJ determined that Ms. H. could perform (1) simple, routine, and repetitive tasks, (2) with no production rate for pace of work, and (3) have occasional interaction with the general public.  *See* AR 45.  Ms. H. argues that the ALJ failed to provide an adequate explanation of the evidence upon which he relied to make this determination, and the ALJ's failure to explain the meaning of the second element, "no production rate for pace of work," warrants remand.  *See* Pl.'s Mem. at 7.  The Court disagrees.

Ms. H.'s briefs fail to articulate what aspect of the ALJ's analysis needed further explanation to support his conclusion that Ms. H. could perform simple, routine, and repetitive tasks, with no production rate for pace of work, other than her challenge to the use of the phrase "production rate for pace of work" which is addressed below.[5]  To the contrary, the ALJ based his RFC determination "upon the totality of the evidence, including the objective findings, the claimant's course of treatment, and her activities of daily living, all of which have been discussed above in this decision, and in affording the statements and testimony of the claimant regarding her subjective complaints and functional limitations some weight."  AR 49.  The ALJ considered a wide variety of evidence, including Ms. H.'s testimony in which she opined on her

---

[5] For this particular argument, Ms. H. did not specifically challenge the ALJ's finding that Ms. H.'s RFC allowed for "occasional interaction with the general public," so the Court will not address that finding here.  *See* Pl.'s Mem. at 7.  Moreover, Ms. H. appears to abandon this specific argument altogether in her Reply; it is not mentioned anywhere in her brief.  *See generally* Pl.'s Reply.

symptoms, in crafting his RFC determination; he explained his reasoning for why he found certain evidence more persuasive than other evidence. *See* AR 45–49; *see also* 20 C.F.R. §§ 404.1520(c) (noting that the ALJ is responsible for determining the persuasiveness of a medical opinion). In coming to his conclusion, the ALJ "analyzed all evidence" and "sufficiently explained the weight" given to "obviously probative exhibits, including evidence that was rejected." *Warfield v. Colvin*, 134 F. Supp. 3d 11, 14 (D.D.C. 2015). The ALJ's decision included a "'narrative discussion describing how the evidence support[ed]'" his conclusion, and an "'accurate and logical bridge'" links the record evidence to the ALJ's conclusions. *Dowell v. Colvin*, 232 F. Supp. 3d 1, 8 (D.D.C. 2017). Thus, the ALJ did not fail to adequately explain his conclusions, and remand is not warranted on this basis.

Next, the Court examines Ms. H.'s argument about the ALJ's use of the phrase "no production rate for pace of work." This Court has, in several instances, considered this exact phrase deployed by ALJs in social security cases. Although the phrase on its own may be unclear, courts have held that its use does not warrant remand if the term is understandable in context or the Court can discern the phrase's meaning. *See, e.g.*, *Minor v. Kijakazi*, No. 20-CV-3577, 2022 WL 17726903, at *5–6 (D.D.C. Dec. 16, 2022) (finding the ALJ's use of the phase unclear but noting that "[a]dditional context can salvage vague terms"); *Johnson v. Kijakazi*, No. CV 18-2749, 2022 WL 2452610, at *3 (D.D.C. July 6, 2022) (holding that the ALJ's lack of explicitly articulating what he meant when using the phrase did not require remand because "the Court can readily discern what the ALJ meant" by reviewing the decision); *Antonio W. v. Kijakazi*, No. 20-CV-1920, 2023 WL 3790700, at *7 (D.D.C. June 2, 2023) (internal citations omitted) ("Because the ALJ's use of the phrase 'no production rate for pace of work' is 'common enough for [the Court] to know what [it] mean[s] without elaboration,' the Court can

meaningfully review the RFC the ALJ has crafted.") (citations omitted); *Johnson v. Saul*, No. 19-CV-3829, 2021 WL 411202, at *6 (D.D.C. Feb. 5, 2021) (remanding the case back to the ALJ but noting that the plaintiff's argument that "[n]o production rate for pace of work" was vague did not alone require remand); *Gregory v. Kijakazi*, No. 21-CV-2115, 2022 WL 7463984, at *6 (D.D.C. Oct. 12, 2022) ("The Court, however, can readily discern the meaning of the term [not at a production pace] as work requiring an employee to keep a particular pace of production."). The Court must therefore determine whether context makes the phrase understandable.

The Commissioner argues that the ALJ provided additional context for this phrase with the first element "simple, routine, and repetitive tasks," and the third element "having occasional interaction with the general public."  Def.'s Mem. at 13.  Those arguments do not necessarily aid the Court's understanding of the term.  However, as discussed below, precedent in this District and other context sheds light on the phrase's meaning.

The court in *Antonio W.*, 2023 WL 3790700, confronted an argument similar to the one raised by Ms. H. here.  There, the claimant argued that the phrase "no production rate for pace of work" used in the ALJ's RFC conclusion—that the claimant could perform "simple, routine, repetitive tasks, with no production rate for pace of work"—"d[id] not contain sufficient information for [the] Court to determine whether the ALJ logically applied the available evidence when forming Plaintiff's RFC."  *Id.* at *6.  The court noted that the phrase "is not so vague as to preclude meaningful review" and referenced other cases in this District in concluding that the phrase means that the claimant is "precluded from work that includes production goals."  *Id.* at *7 (citing *Johnson*, 2021 WL 411202 at *6 n.5).  The court also found helpful the definition of "production rate pace" in the Dictionary of Occupation Titles ("DOT"), which

explains how the term should be viewed in the context of Light Work job positions.[6]  *See id.* at *7 n.7.

In advocating for her position, Ms. H. cites to several Fourth Circuit cases where courts held that the ALJ provided an insufficient explanation regarding the phrase's meaning and as a result remanded the RFC determination.  *See* Pl.'s Mem. at 7–10.  However, those Fourth Circuit cases, although relevant to her argument, are neither binding nor persuasive.  Recent precedent from this District is equally relevant and more persuasive.

In light of the case law and context in which the phrase is used in the ALJ's opinion, the Court concludes that the phrase "no production rate for pace of work" is not vague; used for Ms. H.'s RFC, it means she could not perform her job at a pace that typically would be required to meet production targets.  Thus the ALJ's use of this phrase regarding the RFC determination does not require remand.

## II.     Moderate Limitations in Concentration, Persistence, or Pace

### A.     The RFC Does Not Adequately Account for Ms. H.'s Moderate Limitations in Concentrating, Persisting, or Maintaining Pace.

"An ALJ must consider a claimant's specific limitations in his or her RFC assessment." *Minor*, 2022 WL 17726903 at *6 (citing *Williams v. Colvin*, 134 F. Supp. 3d 358, 365 (D.D.C. 2015)).  "[A]n ALJ must also convey these limitations accurately in hypothetical questions posed to [vocational experts] so that the expert can accurately assess if jobs exist for the claimant to perform."  *Id.* (citing *Mirlin T. v. Kijakazi*, No. 20-CV-00960, 2021 WL 9217635, at *10 (D.D.C. Aug. 24, 2021), *report and recommendation adopted*, No. 20-CV-960, 2022 WL 3139032

---

[6] Dictionary of Occupational Titles, Appendix C https://perma.cc/LCL6-SBJ5 (In describing Light Work Strength Factors, it says: "The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.").

(D.D.C. Aug. 5, 2022)).  Failing to do so may "serve as grounds for reversal because it 'undermines the expert's testimony that a claimant can perform other work,' an instrumental aspect of determining whether the claimant qualifies for disability benefits."  *Id*. (citing *Mirlin T.*, 2021 WL 9217635, at \*10).

Here, the ALJ determined that Ms. H. has moderate limitations in concentrating, persisting, or maintaining pace, which resulted in the RFC to: (1) perform simple, routine, and repetitive tasks, (2) with no production rate for pace of work, and (3) have occasional interaction with the general public.  *See* AR 45.  Ms. H. argues that the ALJ failed to include her moderate limitations in concentrating, persisting, or maintaining pace in the RFC assessment and in hypothetical questions posed to the vocational expert.  *See* Pl.'s Mem. at 10.  The Commissioner counters that Ms. H.'s moderate limitations are accounted for mainly through the first RFC element (limiting her to simple and repetitive tasks), which reduces work changes, and the third RFC element (limiting her social interactions), which reduces distractions.  *See* Def.'s Mem. at 15–16.  Notwithstanding the Commissioner's argument, the Court finds that the ALJ's RFC does not properly account for Ms. H.'s concentration-based limitations.

The ALJ discussed the evidence surrounding Ms. H.'s concentration limits in concluding that her limitations in such area were moderate.  *See* AR 44.  He referenced reports that Ms. H. had "impairments [that] affect[ed] her ability to concentrate and complete tasks."  *Id.*  He also noted the State Agency doctors' reports which noted that Ms. H. had "moderate limitations in this domain."  AR 44–45.  But the ALJ failed to mention Ms. H.'s concentration-based limitations in describing her RFC or in any of the hypothetical questions posed to the vocational expert.  *Minor*, 2022 WL 17726903 at \*6.

The first RFC element, limiting Ms. H. to "simple, routine and repetitive tasks," AR 45, does not adequately account for Ms. H.'s concentration-based limitations. "Generally, limiting a claimant to 'simple, routine, and repetitive tasks' is insufficient to incorporate a moderate limitation in maintaining concentration, persistence, or pace." *Mirlin T.*, 2021 WL 9217635, at *10 (citing *Petty*, 204 F. Supp. 3d at 206). "[T]he problem with finding a moderate [concentration, persistence, pace] limitation by requiring 'simple, routine, and repetitive tasks' is that such a restriction, without more, does not actually address plaintiff's mental impairments because the difficulty of a task does not necessarily say anything about [her] ability to concentrate on it." *Johnson*, 2021 WL 411202, at *5. A moderate limitation in concentration, persistence, or pace "affects [a claimant's] 'ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.'" *Petty*, 204 F. Supp. 3d at 206 (citing 20 C.F.R. § 404.1520a(c)(2); 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00). And thus, the ability to engage in simple work "does not support an assumption that [a claimant] is capable of *sustaining* focused attention and concentration for a significant amount of time." *Minor*, 2022 WL 17726903, at *7 (citing *Mirlin T.*, 2021 WL 9217635, at *10) (emphasis in original). "[T]he ability to perform simple tasks differs from the ability to stay on task." *Antonio W.*, 2023 WL 3790700, at *9 (citations omitted).

Nor does the second element, limiting Ms. H. to perform "with no production rate for pace of work" adequately account for her concentration-based limitations. "[N]ot having to meet production goals or quotas does not explain how long [a claimant] can stay on task in a given eight-hour day for five days a week (or an equivalent work schedule)." *Johnson*, 2021 WL 411202, at *6 (citations omitted).

The third element of Ms. H.'s RFC, limiting Ms. H. to "hav[ing] occasional interaction with the general public" also fails to adequately account for her concentration-based limitations. Limiting a claimant to "'no more than occasional changes in the work setting' does not have any bearing on the pace or stress level at which plaintiff would be expected to work." *Minor*, 2022 WL 17726903, at *6 (citing *Xavier S. v. Saul*, No. 19-CV-1195, 2020 WL 1015816, at *25 (E.D. Va. Mar. 2, 2020)).  This Court has found RFC limitations that include similar, if not more, restrictions to be insufficient in encapsulating the claimant's moderate limitations in concentration.  *See, e.g.*, *Johnson*, 2021 WL 411202, at *5 (holding that the RFC limiting the claimant to "occasional interaction with co-workers, supervisors, and the general public;" "occasional changes in the work setting;" and "occasional judgment or decision-making" did not adequately capture the claimant's moderate limitations in concentration); *Nsiah v. Saul*, No. 19-CV-00042, 2020 WL 12948519, at *14 (D.D.C. May 12, 2020), *report and recommendation adopted sub nom. Nsiah v. Saul*, No. 1:19-CV-00042, 2021 WL 372784 (D.D.C. Feb. 3, 2021) (finding "occasional changes in a routine work setting and occasional interaction with the public, co-workers, and supervisors" to be insufficient in capturing the claimant's concentration limitations).

In sum, the ALJ erred by not adequately incorporating Ms. H.'s concentration-based limitations in his RFC determination or the hypotheticals posed to the vocational expert.

**B.      The Error Is Harmless.**

Errors of this kind are considered harmless if "(1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly accounted for a claimant's

limitations in concentration, persistence, and pace." *Petty*, 204 F. Supp. 3d at 206 (citations

omitted).  The Court concludes that the first means of establishing harmless error applies, and

thus will not reach the second test.  Specifically, "medical evidence demonstrates that [Ms. H.]

can engage in simple, routine tasks or unskilled work despite limitations in concentration," and

the hypothetical on which the RFC is based "is limited to include only unskilled work."  *Id.*

(citations and internal quotation marks omitted).

Medical evidence demonstrates that Ms. H.'s concentration-based limitations do not

preclude her from engaging in simple, routine, or unskilled work.  Ms. H. reported that her

memory is intact, her ability to pay attention "depends on chronic pain," and she finishes what

she starts.  AR 367.  As the ALJ notes, Ms. H. also reported an ability to shop in stores and go to

a variety of places on a regular basis.  *See* AR 44, 363–67.  Assessments in July 2017 and

September 2017 both indicate that Ms. H. was determined and her motivation was good.  *See* AR

1372, 1388.  Assessments from February 2018 through April 2018 consistently noted that her

motivation was good.  *See* AR 804, 808, 814, 827, 833.  At around the same period, in March

2018 and June 2018, the State Agency psychological consultants, whose opinion the ALJ found

to be "generally persuasive," AR 48, consistently opined that Ms. H. is "moderately limited" in

"[t]he ability to complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable

number and length of rest periods,"[7] AR 116, 132, 151, 168.  They further opined that her ability

---

[7] This statement alone may not be sufficient to show that a claimant can perform simple, routine, and repetitive tasks.  *See Demetria R. v. Kijakazi*, No. 20-CV-3227, 2022 WL 3142376, at *16 (D.D.C. June 30, 2022), *report and recommendation adopted*, No. CV 20-3227, 2022 WL 3139026 (D.D.C. Aug. 5, 2022) (holding that the same language, without any further explanation from the physicians, did not show that the claimant could sustain "simple, unskilled work for an extended period of time") (internal quotation marks omitted); *see also Simmons v. Saul*, No. 18-CV-1293, 2019 WL 12251882, at *18 (D.D.C. Sept. 30, 2019), *report and recommendation*

to sustain attention to long, complex activities can be affected by irritability and depression, but "[s]he can carry out routine tasks on a regular basis to complete a normal workweek." *Id.*  Ms. H. has identified no record evidence to contradict these specific medical findings.  Substantial evidence therefore supports the ALJ's determination that Ms. H. can engage in simple, routine, or unskilled tasks despite her moderate limitations in concentration, persistence, and pace.

Moreover, the challenged hypothetical that Ms. H.'s RFC is based on is limited to include only unskilled work.  *See Petty*, 204 F. Supp. 3d at 206.  Even though the ALJ did not explicitly limit his description to unskilled work, the vocational expert's answers were limited to unskilled work.  As noted above, three hypothetical individuals were considered.   Dr. Ryan explained that the first and second hypothetical person could perform the work of a packer and packaging worker, office helper, inspector, "[and] each is *unskilled*."  AR 98 (emphasis added).  Dr. Ryan explained that the third hypothetical person could perform the work of a finish machine tender, table worker, security worker, which are all "sedentary, *unskilled*" occupations.  AR 99 (emphasis added).

A strict reading of the harmless error analysis may suggest that the ALJ himself is required to include a claimant's limitations in concentration, persistence, and pace in the hypothetical.  *See Petty*, 204 F. Supp. 3d at 208 ("[T]he *ALJ's hypothetical* should explicitly or implicitly incorporate [a claimant]'s moderate mental limitations and any potential affect they have on [the claimant]'s ability to complete simple, routine, repetitive and unskilled tasks for

---

*adopted*, No. CV 18-1293, 2019 WL 12251883 (D.D.C. Oct. 22, 2019) (holding that the same language, without any further explanation, could not be squared with the ALJ's "implicit determination" that the claimant was capable of performing "simple, routine[] tasks for an extended period of time").

    This case distinguishes itself from *Demetria R.* and *Simmons* because the State Agency psychological consultants provided additional explanation—regarding Ms. H.'s ability to perform simple tasks—that was lacking in *Demetria R.* and *Simmons*.

sustained periods of time.") (emphasis added).  However, courts have found that the ALJ's failure to include a claimant's limitations in the hypothetical is harmless when the vocational expert provides jobs that explicitly include the claimant's limitations.  *See Glass v. Saul*, No. 19-CV-1804, 2021 WL 1405726, at *6 (D.D.C. Apr. 14, 2021), *aff'd sub nom. Glass v. Kijakazi*, No. 21-5141, 2022 WL 566488 (D.C. Cir. Feb. 23, 2022), *reh'g denied*, No. 21-5141, 2022 WL 2836757 (D.C. Cir. July 14, 2022) (finding the ALJ's omission of "unskilled" in the hypothetical to be a harmless error when the vocational expert provided jobs that were "unskilled" and the claimant's RFC was thus based on unskilled work); *see also Chrismon v. Colvin*, 531 F. App'x 893, 899 (10th Cir. 2013) (finding the ALJ's omission of "simple, repetitive tasks" to be a harmless error when at least two of the four jobs identified by the vocational expert were "simple, repetitive").

"Remand is inappropriate where it would be an idle and useless formality, or when, on the basis of the record, a court is convinced that remand would result in the ALJ's reaching the same result." *Gordon v. Colvin*, No. 15-CV-1028, 2016 WL 6088263, at *15 (D.D.C. Sept. 30, 2016), *report and recommendation adopted*, No. 15 CV 01028, 2016 WL 6088266 (D.D.C. Oct. 18, 2016) (internal citations and quotation marks omitted).  Even if this case were remanded on the grounds that the ALJ himself did not limit the hypothetical to "unskilled" jobs, the vocational expert would provide the same answers, based on which the ALJ would reach the same result.  Therefore, remand here would be a useless formality and inappropriate.  The ALJ's error of not adequately incorporating Ms. H.'s concentration-based limitations in his RFC determination is therefore harmless.

**III.    Function-by-Function Assessment of Ms. H.'s Abilities to Stand, Walk, Lift, or Sit**

Ms. H. argues that the ALJ failed to perform a proper function-by-function assessment because (1) he failed to "*first* identify [her] functional limitations . . . and *only then* express the [RFC] in terms of exertional levels of work"; and (2) he failed to "evaluate [her] abilities to stand, walk, lift, or sit."  Pl.'s Mem. at 15 (emphasis in original).  In support of her argument, she relies on the Social Security Ruling 96-8p, which states that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including [sitting, standing, walking, lifting, carrying, pushing, and pulling]" before the RFC may be "expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996) [hereinafter SSR 96-8p].

Ms. H.'s first argument, that the ALJ's RFC assessment "*must first* identify [her] functional limitations . . . and *only then* express the residual functional capacity in terms of exertional levels of work," is incorrect.  Pl.'s Mem. at 15 (emphasis in original).  This Court has repeatedly rejected that argument.  *See, e.g.*, *Colter v. Kijakazi*. No. CV 20-0632, 2022 WL 715218, at *9 n.4 (D.D.C. Mar. 10, 2022) ("That the ALJ expressed Plaintiff's RFC at the beginning in his point heading regarding step four of his analysis does not indicate that the ALJ started with a particular conclusion in mind and worked backward to provide justification for said conclusion" and finding no error in this regard).

Ms. H.'s second argument, that the ALJ's failure to evaluate her abilities to stand, walk, lift, or sit warrants remand, is also incorrect.  To support her argument, Ms. H. again relies on a Fourth Circuit case, *Dowling v. Commissioner of Social Security Administration*.  986 F. 3d 377

22

(4th Cir. 2021); s*ee* Pl.'s Mem. at 15–17.  Not only is the opinion "not binding" upon this Court, *Colter*, 2022 WL 715218, at *8, but also "[it] stops short of adopting a *per se* rule requiring remand where the ALJ does not perform an explicit function-by-function analysis," *Jamil D. v. Kijakazi*, No. 21-CV-464, 2022 WL 910334, at *11 n.10 (D.D.C. Mar. 29, 2022) (internal quotation marks and citations omitted).

Moreover, this Court has consistently declined to hold that an ALJ must address, in writing, every work-related function listed in either 20 C.F.R. § 416.945 or SSR 96-8p; that is unnecessary provided that the ALJ includes a thorough narrative discussion explaining how the record evidence supports his conclusions.  *See, e.g.*, *Banks v. Astrue*, 537 F. Supp. 2d 75, 85 (D.D.C. 2008) ("[A] written function-by-function analysis is not required."); *Kim M. v. Kijakazi*, No. 20-CV-2072, 2021 WL 4033060, at *7 (D.D.C. Sept. 3, 2021) (collecting cases); *Jamil D.*, 2022 WL 910334, at *9 ("SSR 96-8p does not provide the specific mandate that an ALJ must undertake a *specific* discussion of each of the seven functions.") (internal quotation marks and citations omitted) (emphasis in original).  The ALJ ruling at issue here provided a sufficiently thorough narrative discussion that addressed the relevant pieces of evidence and explained Ms. H.'s abilities to stand, walk, lift, and sit.

The ALJ began the RFC analysis by recounting Ms. H.'s allegations that "her impairments affect her ability to lift, squat, bend, stand more than 10 minutes without use of a cane, reach, sit, kneel, climb stairs, complete tasks, concentrate and use her hands" and that she can "walk at most [half] block before needing to stop to rest and catch her breath."  AR 46, 362–68.  While acknowledging that her symptoms had some grounding in the medically determinable impairments, the ALJ then discussed evidence in the record that conflicted with her statements concerning the intensity, persistence, and limiting effects of the symptoms.  *See* AR 46.

As to her left ankle, the ALJ recited radiological findings from January 2018 that revealed most of the findings are normal.  *See* AR 47, 1698 (noting that marrow signals are normal, tendons are intact, and the Achilles is normal).  He also cited to the April 2018 records that revealed there was no tenderness, no pain to palpation; no swelling, edema or erythema of the surrounding tissue; normal strength and tone, no laxity; no instability; normal range of motion; no known fractures or deformities; and normal sensation and coordination.  AR 47, 794–96.  He further noted the December 2018 records which revealed that Ms. H. experienced swelling, diffuse pain, and guarding of the ankle, but her gait was only mildly antalgic.  *See* AR 47, 1508.  These records gave the ALJ ample reason to conclude that Ms. H.'s alleged symptoms were not disabling.

As to her right shoulder, the ALJ noted that despite a new rotator cuff tendon tear, there was "no glenohumeral joint effusion, no definite abnormality in the quadrilateral space or spinoglenoid notch and no enlarged axillary lymph nodes."  AR 47.   The ALJ then discounted the disabling effects of her limitations by noting the emergency room records in June 2019.  *See id*.  The records indicate that the medication discussed was mildly helpful, she was not interested in following up with an orthopedic specialist, and that she was discharged in stable condition.  *See* AR 965–66.

Ms. H. argues that "the [ALJ] did not find that [she] could lift up to 20 pounds at a time, did not find that [she] could frequently lift or carry objects weighing up to 10 pounds, did not find that [she] was capable of sitting most of the time with some pushing and pulling of arm or leg controls, did not find that [she] was capable [of] standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday" and therefore failed to properly explain his RFC assessment.  Pl.'s Reply at 4.  This argument is incorrect for two reasons.

First, "the fact that the ALJ did not explicitly and separately discuss the number of hours [a claimant] can stand, the number of hours [s]he can walk, the number of hours [s]he can sit, the number of hours and the amount of weight [s]he can lift, and the number of hours and amount of weight [s]he can carry during a work day does not require a finding that the Commissioner's decision was not supported by substantial evidence." *Jamil D.*, 2022 WL 910334, at *9 (citing *Simmons*, 2019 WL 12251882, at *13) (internal quotation marks omitted).  SSR 96-8p "does not provide the specific mandate that an ALJ must undertake a specific discussion of each of the [] functions." *Jamil D.*, 2022 WL 910334, at *9 (internal citations and quotations omitted).  Thus, the ALJ did not err by failing to explicitly mention the number of hours Ms. H. can stand, walk, or sit or the weight she can lift.

Second, contrary to Ms. H.'s argument, the ALJ *did* consider persuasive the State Agency medical consultants' opinions, which found that Ms. H. can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for 6 hours in an 8-hour workday, and sit for more than 6 hours in an 8-hour workday.  *See* AR 48, 113, 129–30, 148, 165.  He also specifically considered and discounted the evidence that suggested otherwise.  *See* AR 48–49.  For example, he found that the opinion provided by Teresa Acquaviva, FNP, in March 2018, that "[Ms. H.] could not lift or carry 10 pounds," is "not persuasive" because it is not consistent with nor supported by the medical evidence.  AR 48–49, 1791–92.

Therefore, although the ALJ did not specifically address each of the seven functions set forth in SSR 96-8p before concluding that Ms. H. could perform light work, the ALJ provided a thorough narrative discussion of the evidence of record regarding her abilities to perform relevant work-related functions in areas in which she alleged limitation; consequently, this error is not cause for reversal or remand.  *See Jamil D.*, 2022 WL 910334, at *11.

**IV.     Whether the ALJ Failed to Evaluate Pertinent Evidence**

Ms. H. argues that the ALJ failed to properly evaluate pertinent evidence about her left ankle.  *See* Pl.'s Mem. at 17.  She points to six pieces of evidence that she claims the ALJ omitted: (1) the record that she underwent left ankle surgery in April 2016; (2) the record that she continued to complain of left ankle pain; (3) her left lower extremity strength measured in May 2017; (4) an MRI evaluation in March 2018 that revealed a chronic sprain or rupture of the anterior talofibular ligament ("ARFL"); (5) an evaluation in April 2018 that revealed nerve entrapment in her ankle; and (6) the visiting nurses' account of her poor balance, ambulation with assistance, and the need for assistance.  *See id.*  Looking at the record as a whole, the Court finds that the ALJ did not err, and substantial evidence supports his RFC findings regarding Ms. H.'s lower extremity limitations.

Contrary to Ms. H.'s assertion, the ALJ did cite to and discuss the first, second, and fifth categories of evidence.  The ALJ noted that Ms. H. underwent the left ankle surgery.  *See* AR 46.  The ALJ also considered and mentioned the October 2016 record, which noted that Ms. H. "complain[ed] of continued pain" but "no longer has any feelings of instability."  AR 46, 658.  The ALJ discussed in detail the examination on April 2, 2018, which "revealed pain on palpation and numbness, but . . . no swelling, erythema or edema of the surrounding issue [and] an examination of the foot and digits was normal."  AR 47, 794–96.

As to the third, fourth, and last pieces of evidence, the Court finds no error in the ALJ's lack of discussion of the specific records.  The ALJ is "not required to recount chapter-and-verse each and every piece of evidence in the medical record."  *Demetria R.*, 2022 WL 3142376, at *11.  Although the ALJ does not mention the third piece of evidence—her left lower extremity digits measured in May 2017—he cites to an examination conducted on a later date which notes

that "[her] foot and digits [were] normal."  AR 47, 794–95.  With regard to the fourth piece of

evidence, the ALJ acknowledged the possibility of Ms. H. sustaining a chronic sprain or rupture

of ARFL; he just cited different medical records in doing so.  For instance, he considered Dr.

Steinberg's report, *see* AR 48, 49, 795–96 (noting that whether Ms. H. likely sustained a rupture

or chronic sprain is not a significant issue), and radiological findings in January 2018, *see* AR

48, 49, 1698.  As to the last piece of evidence, which presumably notes Ms. H.'s poor balance,

ambulation with assistance, and the need for assistance,[8] the ALJ recognized Ms. H.'s statements

that she needed assistance for daily chores and that she used a cane.  *See* AR 46, 362–69.

Therefore, the Court finds no cause to remand this case on the ground that the ALJ failed

to consider pertinent evidence.  The ALJ considered evidence regarding Ms. H.'s lower

extremity limitations and took it into account in his analysis.  *See* AR 46–47.  Accordingly, the

ALJ adequately accounted for Ms. H.'s lower extremity limitations based on substantial

evidence, which is a "low" bar.  *Louisiana Pub. Serv. Comm'n v. FERC*, 20 F. 4th 1, 7 (D.C. Cir.

2021) (noting the low bar of the substantial evidence standard).  "[T]he ALJ provided a thorough

narrative discussion of [Ms. H.'s] limitations, and has built a logical bridge from the evidence to

his conclusion."  *Jamil D.*, 2022 WL 910334, at *11 (internal quotation marks and citations

omitted).

---

[8] Ms. H. advanced this argument without including a specific citation.  *See* Pl.'s Mem. at
17.  Thus, it is not entirely clear to which evidence she is referring.  For the purposes of
discussion, the Court assumes that she is referring to the evidence discussed in other parts of her
brief.  *See id.* at 3–4 ("[Ms. H.'s] home health aide assistance was increased to seven days per
week;" she was "ambulatory with assistance, and to utilize a cane, to have poor balance, to
exhibit considerable and taxing effort to leave her home, and to require assistance to get up [or]
move safely.") (internal citations omitted).

## CONCLUSION AND ORDER

For these reasons, the Court **DENIES** Ms. H.'s Motion for Judgment of Reversal, and

**GRANTS** the Commissioner's Motion for Judgment of Affirmance.

Dated this October 31, 2023.

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE